UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CR. NO. 19-232 (ESG)** |
| **MAURICE JONES** | ) | |

## EMERGENCY MOTION FOR RELEASE PENDING SENTENCING DUE TO THE COVID-19 PANDEMIC

Maurice Jones, through undersigned counsel respectfully moves this Court to release him, pursuant to the Bail Reform Act and the U.S. Constitution, to home confinement into the High Intensity Supervision Program ("HISP") to assure his safety and the safety of others in the community during the current Coronavirus pandemic, until sentencing in this matter. Mr. Jones is a **63 year-old** detained at the Correctional Treatment Facility (CTF), who is detained in the 50 and older unit, which is specialized housing unit to accommodate the needs of inmates 50 years or older. Mr. Jones has **diabetes, had prostate cancer, high cholesterol, and arthritis**. Due to his medical condition, Mr. Jones risks becoming terminally ill if he contracts COVID-19. Currently, there are five (5) men in his unit who have tested positive for COVID-19. Due to these unusual and dire circumstances, Mr. Jones seeks his immediate release in order to proceed with sentencing. Undersigned counsel's office requested that the government agree to his release, but the government intends to oppose this motion.

Mr. Jones has been detained at CTF since July 5, 2019 and taking responsibility for his crime, pled guilty on February 20, 2020. Circumstances in the United States have radically changed since Mr. Jones pled guilty. Weeks after his court appearance, COVID-19 has emerged as a global and national health emergency. COVID-19 poses a clear and present danger to Mr.

Jones and to the community.  It appears to be as much as many times deadlier than the flu.  It kills the elderly and the ill at terrifyingly high rates.  Experts have explained that jails and detention facilities are hotbeds for this disease; infections, begun in jail, will spread into the community more broadly, ultimately taking lives.  Mr. Jones falls within one of the most at-risk populations for this disease.  Right now, Mr. Jones's life and the safety of the community will best be protected by his release.

The emerging consensus among public health experts is that it is absolutely critical to reduce incarceration in order to contain the spread of this virus.  *See* Ex. A, Beyrer Dec. ¶¶ 17-19.  It is equally critical for Mr. Jones's own safety.  He respectfully asks for release to home confinement pending sentencing, which is being delayed because virus is spreading at CTF.[1]

**Background**

On February 20, 2020, Mr. Jones pled guilty to one count of aiding and abetting his co-defendant's using, carrying, possessing, and brandishing a firearm during a crime of violence, in violation of Title 18, United States Code, § 924(c)(l)(A)(i), and § 2, one count of Robbery, in violation of 22 D.C. Code § 2801, two counts of Second Degree Theft, in violation of 22 D.C. Code §§ 3211, 3212(b), and one count of Destruction of Property, in violation of 22 D.C. Code § 303.  On March 16 2020, the District issued a standing order postponing all criminal proceedings until on or after April 17, 2020.  *In Re: Court Operations in Exigent Circumstance Created by*

---

[1] As the Court knows, this situation is extremely fast moving.  This briefing is based on the best information available as of April 9, 2020.

*the Covid-19 Pandemic*, Standing Order No. 20-9 (D.D.C. Mar. 16, 2020) (citations omitted).[2] As a result, the scheduled presentence investigation interview had to be postponed.[3] The sentencing hearing scheduled for July 1, 2020 has also been vacated for a later date due to the pandemic.[4]

It is currently reported that 41 inmates have tested positive for COVID-19.[5] Mr. Jones is in a high risk category due to his age and medical conditions. It is in his best interest to be removed and placed on home confinement. This would allow Mr. Jones to proceed with the presentence investigation report interview and access to counsel, and allow the Court and parties to proceed with sentencing. The alternative is that Mr. Jones remains at CTF and thus at risk of contracting COVID-19 and becoming terminally ill.

**I.     COVID-19 continues to spread throughout the United States killing an average of 200 people a day.**

The new strain of coronavirus which causes COVID-19 was first detected in Wuhan, China late last year, and as of today, has infected over 1.5 million people, leading to at least 96,525 deaths worldwide. *Coronavirus Map: Tracking the Spread of the Outbreak*, The New

---

[2] As the District's standing order recognizes, on March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic. *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), https://bit.ly/2W8dwpS. D.C. Mayor Muriel Bowser declared a state of emergency and banned all gatherings in the District of more than 250 people. *See* Jenna Portnoy *et al.*, *D.C. declares state of emergency as concerts, parades, church services are canceled*, washingtonpost.com (Mar. 12, 2020); *see also* Coronavirus (COVID-19), https://coronavirus.dc.gov.

[3] *See* Unopposed Motion to Continue Sentencing Deadlines and Sentencing Hearing filed at ECF No. 32 and March 20, 2020 Minute Order granting the Unopposed Motion.

[4] *See* Probation Petition filed at ECF No. 35 and April 9, 2020 Minute Order granting the Unopposed Motion.

[5] This information is based on the DOC COVID-19 Daily Report for April 9, 2020 email provided by Eric Glover, DOC General Counsel.

York Times (March 15, 2020), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updating regularly; last updated April 10, 2020 at 9:00 am ET).  In the United States, since it was first detected on January 22, 2020, there have been 16,695 deaths in 79 days. *Id.* This is an average of over 200 people a day dying from this virus.  And the United States has the highest number of infected individuals in the world.

In District of Columbia, Maryland, Virginia, there are over 13,000 confirmed cases, with 331 deaths.[6]  In the early numbers for the District of Columbia, two confirmed cases were from United Medical Center ("UMC") (the former Greater Southeast Hospital), the District's public hospital in Southeast.  Jenna Portnoy, *Coronavirus in the DMV: What You Need to Know*, washingtonpost.com (April 1, 2020); Peter Jamison & Keith L. Alexander, *D.C. public hospital emergency room doctor tests positive for coronavirus*, washingtonpost.com (Mar. 16, 2020). "UMC is Washington's only full-service hospital east of the Anacostia River, serving predominantly African American neighborhoods whose residents struggle with severe disparities in health-care access even when a pandemic is not underway." *Id*.  UMC serves the community in which D.C. Jail is located and those people most likely to be held at and visit D.C. Jail.

## II.  D.C. Jail Is Not Sanitary and Has Been Exposed to COVID-19.

As of June 2018, the average daily population at the D.C. Jail was 1,346.  Ed Pound *et al.*, *Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks*, Office of the D.C. Auditor 1 (Feb. 28, 2019), www.dcauditor.org.  The D.C. Department of Health "has cited DOC for repeated and uncorrected violations of industry standards related to environmental

---

[6] Dana Hedgpeth, *Live updates: Maryland sees biggest single-day increase in deaths; D.C. mayor reminds residents to stay home over Easter*, updated April 10, 2020 at 12:19 pm, https://www.washingtonpost.com/dc-md-va/2020/04/10/coronavirus-dc-maryland-virginia-live-updates/

conditions, including room temperatures, **sanitary conditions**, pests, broken fixtures, and inadequate lighting, among other issues. DOH also has cited both DOC and the food service provider Aramark for repeated violations of District regulations related to public health and food service." *Id*. at 7 (emphasis added). Of particular relevance, in March 2018, DOH found that DOC did not comply with standards designed to ensure that "cellblocks and common areas were maintained in a clean and sanitary manner." *Id*.

The D.C. Department of Corrections ("DOC") has not, to date, to defense counsel's knowledge, taken adequate precautionary measures to stem the spread of this virus, as it is still accepting new arrests. On or about March 26, 2020, one person tested positive for COVID-19.[7] *In 15 days, that number has jumped to 41 inmates testing positive*.[8] It has been reported that DOC leaders are not accurately reporting COVID-19 cases.[9]

The DOC is not equipped to treat inmates who contract Coronavirus. Van Jones & Jessica Jackson, *A prison pandemic? Steps to avoid the worst*, cnn.com (Mar. 12, 2020; 6:47 p.m.). "Given the crowded nature of our correctional institutions, an outbreak is likely and the probability of correctional staff and visitors picking up the virus and carrying it back into their communities could be high. Public official must address this threat seriously." *Id*. "An

---

[7] Washington Post Live Update at 6:26 a.m. reporting that an inmate that the Correctional Treatment Facility tested positive for COVID 19 available at https://www.washingtonpost.com/dc-md-va/2020/03/26/coronavirus-dc-maryland-virginia-updates/ (last viewed on March 26, 2020 at 9:00 a.m.).

[8] This information is based on the DOC COVID-19 Daily Report for April 9, 2020 email provided by Eric Glover, DOC General Counsel.

[9] Khalida Volou, Saliqa Khan, Nathan Baca, *'We are afraid' | Inmates, officers not protected against COVID-19 at DC jail, DC correctional officials allege*, https://www.wusa9.com/article/news/health/coronavirus/dc-department-of-corrections-announces-lawsuit-filed-against-jail/65-300b86ac-590e-4b35-93f0-713c1df5a7a3, (Published April 1, 2020).

outbreak of the deadly virus inside the walls of a U.S. prison or jail is now a question of when, not if, according to health experts." Rich Schapiro, *Coronavirus could 'wreak havoc' on U.S. jails, experts warn*, nbcnews.com (Mar. 12, 2020; 1:04 p.m.). Indeed, "the combination of staffers moving in and out of prisons and the already unsanitary conditions inside many of them increase the likelihood of serous coronavirus outbreaks." *Id*.; *see also Explainer: Prisons and Jails Are Particularly Vulnerable to Covid-19 Outbreaks*, The Justice Collaborative (accessed Mar. 18, 2020).[10]

Lack of sanitation, close quarters, and limited medical capacity make D.C. Jail an incubator and ticking time bomb. Reducing the population of those in custody at D.C. Jail is essential to the safety of everyone in the community.

### III. COVID-19 Places Certain Population Groups at Greater Risk.

COVID-19 causes some population groups to die at far greater rates than others. A person's likelihood of dying from this disease varies dramatically depending on two key factors: 1) their demographic profile and 2) the environment where they live.

#### a. COVID-19 kills the sick at heartbreaking rates.

COVID-19's death rate goes up 1) the older you are and 2) the sicker you are. *See* Beyrer Dec. ¶ 6. COVID-19's comorbidity death rate is frightening. Across all age groups, COVID-19 kills:

---

[10] https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf

| Condition | Case Fatality Rate |
|---|---|
| Cardiovascular disease | 13.2% |
| Diabetes | 9.2% |
| Hypertension | 8.4% |
| Chronic respiratory disease | 8% |
| Cancer | 7.6%[11] |

In Wuhan, of the hospitalized population who ended up dying from COVID-19, 48% of them had hypertension, 31% had diabetes, and 24% had coronary heart disease. *See* Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

For these reasons, the best epidemiological advice to deal with this national health emergency is that inmates "with chronic conditions predisposing to severe COVID-19 disease . . . should be considered for release." Beyrer Dec. ¶ 18. Notably, even young people with no known medical conditions have died from COVID-19. In New York City, currently the

---

[11] *See* World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv at 5 (Feb. 27, 2020), https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, and the number for two comorbidities was 2.59).

country's epicenter for the pandemic, younger adults are being hospitalized for COVID-19 at high rates. In one case of a 32 year old man:

> The young man, who had no underlying medical conditions, was short of breath with a fever, and his oxygen levels were dropping rapidly. He'd come to the hospital's emergency department four days earlier but was told to go home, drink water, take Tylenol and self-isolate. Now he was back and his condition was deteriorating. "The level of fear in his eyes stood out to me," Jackson, an emergency medicine physician, recalled in an interview Tuesday. "He was extremely scared. And he was so young.

Michelle Fay Cortez and Olivia Carville, *Many New York Coronavirus Patients Are Young, Surprising Doctors*, https://www.bloomberg.com/news/articles/2020-04-01/coronavirus-in-young-people-ny-patients-skew-younger-some-die (published April 1, 2020); *see also* Joshua Rhett Miller, *Michigan college student dies of coronavirus weeks before graduation* https://nypost.com/2020/03/30/michigan-college-student-dies-of-coronavirus-weeks-before-graduation/ (last accessed on April 1, 2020) (25 year old college student "had no known prior health issues before succumbing to COVID-19")

### b. COVID-19 poses acute risks to inmates and correctional staff.

Incarceration poses a ***grave public health threat*** during this crisis. "COVID-19 poses a serious risk to inmates and workers in detention facilities." Beyrer Dec. ¶ 11. It is well-known in the epidemiological community that such facilities are "associated with high transmission probabilities for infectious diseases." Beyrer Dec. ¶ 11; *see also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910; Laura M. Maruschak et al. (2015), Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, NCJ 248491; U.S. Dep't of Just., Bureau of Justice Statistics, www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf. Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high

numbers of cases.  *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://bit.ly/2TNcNZY.

When outbreaks occur in prisons, this leads directly to increased spread beyond the confines of jail.  *See* Beyrer Dec. ¶ 12.  "It is therefore an ***urgent priority*** in this time of national public health emergency to reduce the number of persons in detention as quickly as possible."  Beyrer Dec. ¶ 17 (emphasis added).  When COVID-19 arrives at DOC, as it likely has, the ramifications for both the incarcerated population and correctional staff will be dire.  "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities."  Beyrer Dec. ¶ 13.  Social distancing and decontaminating surfaces is "virtually impossible."  *Id.*  Furthermore, "[t]he high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure."  *Id.*

U.S. Detention Facilities already have a track record of mismanaging infectious diseases, *see id.*, and the fact that it remains business as usual in our jails is highly troubling.  At this moment in our national history there can be no doubt: "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole."  Beyrer Dec. ¶ 19.

Public health experts agree that reducing incarceration is crucially important at this time – when we have all been directed to avoid crowds greater than 10, and when our own courts are shutting their doors to the public in order to protect court staff and contain COVID-19's spread. Under these circumstances, Mr. Jones's presentence investigation interview cannot happen; his family cannot be present to support him at his sentencing as they have been present for every one of his court appearances.  He should be released pending sentencing.

**IV.    COVID-19 Poses an Extreme Risk to Mr. Jones.**

Mr. Jones falls squarely within one of the most at-risk populations for this virus.  Mr. Jones has **diabetes, had prostate cancer, high cholesterol, and arthritis,** and thus is "more likely to develop severe illnesses and to die, research shows," from COVID-19.  Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, nytimes.com (Mar. 12, 2020; updated Mar. 14, 2020).  "**People who have chronic medical conditions, such as diabetes, lung disease and heart disease, face an increased chance of being hospitalized with covid-19 and put into intensive care.**"  Joel Achenbach and William Wan, *New CDC data shows danger of coronavirus for those with diabetes, heart or lung disease, other chronic conditions*, https://www.washingtonpost.com/health/new-cdc-data-on-underlying-health-conditions-in-coronavirus-patients-who-need-hospitalization-intensive-care/2020/03/31/0217f8d2-7375-11ea-85cb-8670579b863d_story.html, (published March 31, 2020 at 5:23 p.m. EDT) (emphasis added).

> The CDC analyzed more than 7,000 confirmed covid-19 cases across the country in which health officials had a written record about the presence or absence of any underlying medical condition. The preexisting conditions covered in the records include heart and lung diseases, diabetes, chronic renal disease, chronic liver disease, immunocompromised conditions, neurological disorders, neurodevelopmental or intellectual disability, pregnancy, current or former smoker status, and "other chronic disease."

*Id.*   Of the analyzed cases, a notable percent had diabetes.  *Id.* ("Among all the cases analyzed, *10.9 percent of patients had diabetes mellitus*, 9.2 percent had chronic lung disease, and 9 percent had cardiovascular disease.")(emphasis added).

In addition, according to the CDC, individuals with compromised immune systems, such as those who have had cancer treatment and arthritis, are "at high-risk for severe illness from COVID-19." Center for Disease Control and Prevention, *Groups at Higher Risks of Illness*,

10

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last viewed April 10, 2020)(explaining that "[m]any conditions can cause a person to be immunocompromised, including **cancer treatment**, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of **corticosteroids**[12] and other immune weakening medications.")(emphasis added).

### V.     Mr. Jones Can be Placed on the HISP and 24-hour Home Confinement pending sentencing.

When, as here, a defendant is pending sentencing, the Bail Reform Act requires the Court to release the defendant if it "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)." 18 U.S.C. § 3143(a)(1) ("If the judicial officer makes such a finding, such judicial officer **shall** order the release of the person in accordance with section 3142(b) or (c)." (emphasis added)).

Mr. Jones has no incentive to flee. He has strong family support, a dedicated wife and several family members here in the Washington, D.C. area. Under HISP and 24 hour monitoring, Mr. Jones would not be permitted to leave his location. Mr. Jones does not pose an unreasonable safety risk to any person or persons on home confinement.

By contrast, Mr. Jones's continued detention poses a grave risk to the community. The more people remain detained in detention facilities, the greater the likelihood of an unchecked outbreak of COVID-19 within our detention facilities and jails. *See* Beyrer Dec. ¶ 11. Such an outbreak will impact inmates, correctional officers, and the communities of which those inmates

---

[12] Corticosteroids are prescribed to treat inflammatory conditions, such as arthritis. *See* https://www.hopkinsrheumatology.org/rheumtv/corticosteroids-the-good-johns-hopkins-rheumatology/

and officers are a part. Additionally, if Mr. Jones falls ill, he will likely be in critical condition, requiring precious resources that are needed to contain this pandemic. Thus, if Mr. Jones remains detained at D.C. Jail, his detention will pose a risk not only to Mr. Jones himself, but also to the community.

We are now in a situation where incarceration poses a grave public threat, such that we must be prepared to accept the risk of pre-sentencing release in order to protect our communities from the dangers posed by concentrated populations and community spread. The epidemiological community speaks with one voice on this point:

- Dr. Beyrer from Johns Hopkins University: "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Beyrer Dec. ¶ 19.

- Dr. Greifinger: "Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention[.]" Ex. B, Greifinger Dec. ¶ 13.

- Dr. Stern: "As a correctional public health expert, I recommend the release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19." Ex. C, Stern Dec. ¶ 11.

- Dr. Meyer, an Assistant Professor of Medicine at Yale School of Medicine: "Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." Ex. D, Meyer Dec. ¶ 37.

Unless our detention practices change significantly, people will die.

**VI.　The Eighth Amendment empowers the Court to release Mr. Jones for COVID-19 related reasons.**

The Eighth Amendment prohibition against cruel and unusual punishment also compels release under the current extraordinary circumstances. The government, in detaining defendants

12

pretrial, must take sufficient protective measures to prevent contraction of COVID-19 in the jail population. Unreasonable risk of COVID-19 contraction will, in itself, constitute an Eighth Amendment violation.

The Supreme Court has held that exposure to environmental threats to an incarcerated person's physical wellbeing where exposure is preventable could constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 28 (1993). In *Helling,* a plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes per day. *See Id*. at 28. At issue was whether this exposure to environmental tobacco smoke (ETS) could constitute a valid claim under the Eighth Amendment, even though the plaintiff had not yet suffered harm. *Id.* at 30. The Supreme Court upheld the decision of the Court of Appeals, finding that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Id.* at 35. "Though *Helling* directly addressed an inmate's exposure to [secondhand smoke], it tacitly acknowledged other situations in which environmental factors can pose an unreasonable risk to an inmate's health, including exposure to 'infectious maladies such as hepatitis and venereal disease' caused by overcrowding, unsafe drinking water, and 'toxic or other substances." *Allen v. Kramer*, 2016 WL 4613360, at *7 (E.D. Cal. Aug. 17, 2016) (quoting *Helling*, 509 U.S. at 33, 35.)

The Ninth Circuit has applied *Helling* to exposure to asbestos finding it was "uncontroverted that asbestos poses a serious risk to human health" and the plaintiff "proffered specific evidence showing that the defendants knew of the existence of and dangers posed by asbestos." *Wallis v. Baldwin* 70 F.3d 1074 (9th Cir. 1995). *Helling* has also been applied to

"contagious diseases caused by overcrowding conditions, *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004); contaminated water, *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001); compelled use of chemical toilets, *Masonoff v. DuBois*, 899 F. Supp. 782, 797 (D. Mass. Sep. 11, 1995), [and] paint toxins, *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999)." *Allen*, 2016 WL 4613360, at *8.

Perhaps most applicable to COVID-19, a number of cases have applied *Helling* to the exposure of inmates to Valley Fever in California. Relying on *Helling*, *Allen v. Kramer* concluded that an inmate plaintiff had alleged an Eighth Amendment violation because he was housed in the Central Valley where there was a relatively high risk of contracting Valley Fever. *See Allen*, 2016 WL 4613360, at *1, 11. *Shabazz* adopted *Allen*'s reasoning and came to the same conclusion. *Shabazz v. Beard*, 2018 WL 1071173, at *7-9 (E.D. Cal. Feb. 27, 2018); *see also Jackson v. California,* 2014 U.S. Dist. LEXIS 22966, at *32-38 (E.D. Cal. Feb. 20, 2014) (overruled on other grounds in *Hines v. Youseff*, 914 F.3d 1218, 1231 (9th Cir. 2019) (explicitly declining to reach Eighth Amendment question but reversing on fact-specific finding of qualified immunity)).

The reasoning of *Allen v. Kramer*, *Shabazz v. Beard*, and *Jackson v. California*, and other cases applying *Helling* to exposure to environmental risks applies with equal or greater force to COVID-19, and establishes that officials who fail to adequately protect inmates from the risk of contracting COVID-19 violate the Eighth Amendment. Where protections from COVID-19 for incarcerated clients are insufficient, as in this case, whether for the jail population as a whole or for particularly at-risk individuals, release is constitutionally mandated.

Mr. Jones is housed at a facility that is unable to adequately protect him from contracting the virus and, more importantly, places him at a heightened risk of exposure due to the

14

environmental conditions. His continued detention under these conditions violates the Eighth Amendment, and necessitates his immediate release.

### VII.   Appropriate release conditions for Mr. Jones.

For the reasons discussed in this motion, pursuant to 18 U.S.C. § 3142(b), and pursuant to the Eighth Amendment to the United States Constitution,  Maurice Jones requests that this Court release him on home confinement.  The most restrictive form of home confinement includes ordering Mr. Jones to wear an ankle monitoring device that allows the Pretrial Services Agency to monitor his location.  Such strict conditions will certainly assure the court that Mr. Jones will not pose any danger to the community.  Indeed, since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[13]

### CONCLUSION

For the reasons stated in this motion, in order to comply with the Bail Reform Act and the United States Constitution, Mr. Jones must be released.  Moreover, Mr. Jones's release is essential for the promotion of public health, to protect Mr. Jones's safety, to protect the safety of the entire community during this global emergency, and to prepare for  and proceed with sentencing in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
UBONG E. AKPAN
Assistant Federal Public Defender

---

[13] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

**CERTIFICATE OF SERVICE**

I, Ubong E. Akpan, certify that on this 10th day of April 2020, I caused a copy of the foregoing Emergency Motion to be filed through the Electronic Case Filing ("ECF") system and served a copy on counsel for the government through the ECF.

                                                                         /s/
                                        UBONG E. AKPAN
                                        Assistant Federal Public Defender